23-59, 20-26-95, 20-29-93, and 21-17-53, United States v. Rainford. Ms. Newman, whenever you're ready, you can take a moment if you need it. I don't want to break it. I'm afraid of buttons. Oh, you have to be strong. Thank you. Good morning. May it please the court, I am Donna Newman and together with Clara Kalhaus, we represent Ryan Rainford, who asked this court to vacate his sentence of 68 months and vacate the district court's order of restitution in the amount of just under $4 million. The district court's application of the three victim enhancements and its finding of loss of $4 million was based on findings not supported by a preponderance of the credible evidence and for that reason constituted an abuse of discretion and also was procedurally unreasonable by application of the guidelines themselves. I do want to make a quick mention of the harmless error versus plain error that the government had mentioned. It's important for the court to understand that in the Rainford sentencing that day, which I believe was January 9th of 2020, the three defendants who had gone to trial were sentenced and the court had asked each of the counsel to be present for the other sentencing, so Mr. Rainford went last. In the other sentencing, the district court had determined both loss and the vulnerable victims and the arguments were the same. And so when Mr. Rainford came to sentencing, the court began with the assumption that those arguments that had been made by counsel in the sentencing memo had already been decided. Let me go to the three victim-related enhancements, which are at issue here, because they did raise Mr. Rainford's guidelines by six levels as they were each two points. First of all, it's important to understand what the court based its analysis of, whether or not what we call the slip-and-fall co-conspirators, and there's no question they were co-conspirators, were victims. And that was based on a misunderstanding or misapprehension of the record, because the court said very plainly that what was the problem here is that they were targeted, people were targeted to be involved in these slip-and-falls, these staged accidents, because they were destitute and poor. Well, that's certainly not the evidence that was presented, as we indicate in our brief in a charge. Didn't they recruit people from homeless shelters? Your Honor, I believe that there was two witnesses who testified to that, but the witnesses who the 11 co-conspirators, slip-and-fall participants, not one said they were destitute. Now, let's go who said those things. First, it was Reginald DeWitt, who then became somebody who participated, and what the court failed to look at was his cross-examination, where he conceded, well, there were people who were homeless, and by homeless he meant in homeless shelters, not homeless on the street, because we don't have any evidence that there was anyone from homeless on the street. Two witnesses of the 11. Can a person not be vulnerable if they're living in a homeless shelter? Well, there are people in homeless shelters who my experience is, and what was stated by the witnesses, that they were there for a while with children, and those are individuals who are usually looking for section 8 housing, and they wait until their number comes up. But that's- So you're not saying that they were co-conspirators and therefore can't possibly be considered victims. You're saying just the facts don't support the idea that they were destitute and vulnerable. Is that your position? Yes, it is, because there are various cases- So you're saying we can consider them victims, even though they, in some sense, were co-conspirators. You're just saying these victims were not especially vulnerable. Well, that's, we have a, what do we have? We have to go on the record. We have 11 witnesses who testified. Not one, not one, said, well, I was recruited because I was destitute. Not one said they were destitute. Well, but if they're not victims, it wouldn't matter if they're vulnerable. So, as to the threshold question, if they are knowingly and willingly participating, I understand there's this provision of 2B1 that says if you get hurt. And I'm going to ask your opposing counsel about this, too. If you get hurt, you're a quote-unquote victim. But if you are knowingly and willingly participating in this and you choose to do it, then if, I mean, are you saying that those people can or cannot be victims? Because we don't have to reach whether they were vulnerable if they're not victims to start with. That is true. And we are saying in this case, this fact scenario, not in the world of cases where there could be somebody. In this case, and as to the guidelines. Well, let's finish that sentence. In this case, what? They are or are not victims. They are not victims because each one of the 11, and that's where the testimony is, indicated, one, they weren't recruited, but were referred by somebody they knew, a friend, or their family member. And, in fact, each one of the 11, maybe but for one, in fact, referred family members, girlfriends, fiances to this slip and fall, and it was them that explained the scheme to the next person who was involved in the staged slip and fall. So that's number one, they were not recruited. Okay, so just to clarify your position. So if, in fact, I understand you're saying the facts are different. But if the facts were that they were recruited outside of homeless shelters, and they participated in the scheme out of desperation, and underwent unnecessary surgeries, and didn't get a lot of money in response, they could be considered victims. You're just saying the facts here don't support that because they were recruited into the scheme by friends and family, and were told about it, and they were not, in fact, recruited from homeless shelters. Is that right? That is correct. In addition, there were not unnecessary surgeries, and I think this is important. The great majority, and Reginald DeWitt, excuse me, I always said it backwards, thank you, indicated this in his course, that they had pre-existing injuries, and that was the testimony. So they came there saying, gee, I have a back surgery. In Kara White's case, she fell coming home from work. She got a knee injury. She remembered her son had been involved in a stage slip and fall, as well as had his own slip and fall, and was referred by the family friend who was Duncan. And so she said, oh, great, now I can get the surgery I needed. And she was not unique. This was the typical of the 11 witnesses. Importantly, the government relied and the court relied only seemed to remember was Kalkanis'. Well, does it matter who is typical? If two of them were recruited out of homeless shelters, and if it is reasonable for the judge to assume that there are no prosperous people in the homeless shelters, then wouldn't they qualify as being victims and vulnerable? In which case, who cares whether the other nine were? All you need is one, really. Well, Your Honor, the problem with that is there is an assumption that I think is false here, based on the testimony, that they were recruited because they were destitute. Remember, these people are referred, not recruited, referred by family and friends. Is that all of the victims? Yes. All of the victims? Yes. But is it not possible for the district court to conclude that even if somebody is brought into or knows about the conspiracy because of family and friends, they're still participating in it because of a vulnerability, and the organizers of the conspiracy take advantage of that? Well, the problem is, Your Honor, with fraud. People engage in fraud because of greed. And, in fact, the 11 witnesses who were the co-conspirators slip and fall, they admitted that. They either engaged in this because they wanted money, not unusual in fraud cases, whether that's people who are engaged in million, trillion-dollar frauds, or people who are wealthy engage in frauds. But that could cut in either direction, right? So somebody could be participating because they need money, meaning out of desperation, or because they need money, meaning out of greed, and the district court had to decide which was which, right? Well, but I understand that. But we don't, the problem we have for the government, and what I find, what I'm suggesting is the court's error is making a leap that because you are in a homeless shelter, you are therefore unusually, right, uniquely, unusually vulnerable. And I dispute that because that assumes that people in homeless shelter are more vulnerable to commit crimes, and they do commit crimes. That's not the statistics, Your Honor. And we don't have that in the record. I have an argument. Can I ask you a question about the restitution? Yes. So you said there was no evidence that the claims submitted by the insurance companies were fraudulent, but didn't Kalkanis testify that 80% of them were fraudulent? I'm sorry, Your Honor. I did not hear. I apologize. You said that there's no evidence to support that the claims submitted by the insurance companies were fraudulent, but Kalkanis testified that 80% of them were fraudulent, right? He testified to that, but he also testified by the cross-examination of the court that, oh, well, it's the majority. And importantly, not one, not one of the 40 intake sheets that he was given, that the government put in, and that at least four or five were shown to him on cross. It could have been more, but several were crowned on cross. Could he identify whether or not these were staged or not staged, whether they had real injuries or that, for example, they came with preexisting injuries? And that's another thing. So the fact that he couldn't identify which was which, even though he testified that 80% of them were fraudulent, you're saying should lead to the conclusion that there just wasn't enough evidence to prove that any of them were fraudulent. Is that your position? But he also said the majority. He didn't just say that. He could not state. He went back and forth. And when you look at the fact that he couldn't even name one, we're talking one, that that is important. And when he was asked- 80% is a majority. Yes, but that's not what was suggested when you read his cross-examination in the context. And the important thing about restitution is that it's not a guess or an approximation. When, in fact, because that's not enough, there were records that they could have looked at. There could have been, and could have even for restitution, submitted medical testimony. Right? We've examined them, et cetera. But they didn't. And interestingly, when the one attorney who worked for the insurance company, I think it was James Aldrich, he had three claims that he dealt with. Of the three, only one he paid. And of those, so two were rejected, which means what does it infer? That the insurance companies reviewed claims, reviewed medicals. That's what he tells us. So what does that mean? That if the claims were not good, that there was- they didn't pay them. That has to do with restitution and actual loss. Which goes- I just want to circle back. When we talk about the offense and we talk about victims, remember that the guidelines tell us it has to be the offense. The offense here was wire and mail fraud. That's the fraud. This is not an assault case. So that's quite different than the victims was the insurance company. And we didn't have 10. We had eight or nine. And when you look at the restitution and you look at what they submitted in those charts, what do we see? It wasn't $100,000. In fact, one settled for $5,000. They settle all the time. So what the intended loss even was questionable. Because everybody knows who's done personal injury work, you could ask for the sky. You're not getting it unless it's corroborated. The insurance- But if there were a lot of claims for $100,000, that could be the intended loss, even if you didn't expect to get it in every case, right? Well, I think intended, even under the case law, has to be reasonably intended. In other words, I could- I've never intended- Yes, it would not. And I think that the looking at the restitution evidence submitted, that supports my contention. Okay, I think we have that argument. Thank you very much, Ms. Newman. You've reserved time for rebuttals. I'll hear from you again. But let's turn to the second appellant. Thank you. Mr. Unger. Good morning. May it please the court, I'm Randall Unger. I represent Robert Locust on his appeal. First, I want to join in the eloquent arguments by my co-counsel with respect to the questions of loss and with respect to the restitution issue. With respect to Mr. Locust in particular, I think that there was error in the sentencing, procedural error in so much as he would properly have been considered a minor participant. I base that upon the government's own statements, I think, that he was the least culpable of the defendants. Yeah, but the relative culpability is not sufficient to make you minor, right? There could be- Correct. I agree with that, but I think even under the traditional test, as far as whether or not somebody's a minor participant, I think he qualified. He had no decision-making ability, no discretion. His profit, if you will, from the scheme was quite small over the course of a couple of years. I think it amounted to something like $60,000. He was essentially a driver. He drove a number of patients to the attorney's offices, to the doctor's offices. I'm not saying that he was not involved, but he certainly would not have dreamt of the scope of the conspiracy. I don't think he had any- Well, he was making sure that other people showed up to their appointments on time and- Right. Right? So he's an organizer of the conspiracy. He's not one of the people just in a one-off pretending to do a slip and fall, right? Well, he was regularly employed as a driver. I mean, that's clear. In fact, I think it was Kalkanis who helped him to get a larger, more reliable vehicle so that he could transport the patients to and from the doctors, the hospitals, and the attorney's offices. Right, so he's recruiting patients. He's making sure they attend their appointments. Well, when you say recruiting, I think there was an allegation as to one specific patient, Mr. Tucker. I think that was the only instance, at least as far as trial testimony, that established that he had, as you say, recruited. I'm not sure if that's the exact- So he perhaps recruited, there's evidence of one patient, but he's making sure all the patients get to their appointments on time. Well, yes, that was his job. I mean, he was- And gets a bigger car to do it more extensively. Yes, which sounds to me like it wasn't even his idea. He had his so-called jalopy that he was using. Kalkanis wasn't satisfied with that. He wanted to make sure that the car didn't break down and he'd be losing business and income. This was not something that was really going to Mr. Locust's benefit. It was for the efficiency of the scheme, but something that he really wasn't directly profiting from. He was being paid, for the most part, as a driver. He had no discretion. The only discretion, really, was showing up on time and making sure to pick up the right passengers. That was the extent of it. So, essentially, these are all the reasons why I would submit that he should have been held as a minor participant. And, therefore, the sentence that was calculated as a result of that error must be vacated. But I would also suggest that there was the substitution of counsel application, which I know I'm kind of going out on a limb on raising that claim, but I think it's appropriate. And I know, I concede, it was made in the middle of trial. That's not the appropriate time to be asking for a new attorney in the midst of a trial. But I think it was justified by the circumstances in this particular case. And I would just note that I do not believe that Mr. Locust waived his right to that application, as the government suggested. Because the court had made clear that it wasn't going to grant the application. Yeah, I think as soon as the application was raised, the district court immediately said, I'm not granting that, without even hearing what the basis was. And I think that's the other problem with this. He did, right? Didn't he ask whether it was because of his lawyer's performance at trial? Yes, but that was the extent of the inquiry. And that's such a broad, generalized type of statement. It really doesn't go into the reasons, which I think a district court has a duty to. I mean, the district court had been observing the whole trial. What other inquiries is he supposed to make, if it's based on their performance at trial? Well, he could at least ask, what particulars are you dissatisfied with? And it wasn't limited to performance, right? He said things like, I can't fight the government and my lawyers. My lawyers have already convicted me. Mr. Locust did, right? Yes, yes. They've convicted me, as well as the government. Something to that effect.  That he has a confidence in his lawyers? Of course, we don't get into the actual discussions that might have occurred between Mr. Locust and trial counsel. We don't know. But that's because the judge never asked. Pardon? The judge didn't inquire at all. Right. Besides this minimal thing, right? Yes, and that's my problem with- So what would Mr. Locust have said? It's not just because of their performance at trial. It's because of what? Well, it seems to me, just from that statement, that there were some confidential discussions that had taken place where- I can't speak for trial counsel. I mean, I just don't know. What the prejudice is? What was the problem with his relationship with counsel that he didn't get a fair trial? I think, and I think the reason it came up only in mid-trial and not prior to trial, you have a situation where- And by the way, I'm not faulting trial counsel's actual performance during the trial. That's not the claim that's being raised. So then what is it? What is the- Well, what I'm saying is that there was a conflict between Mr. Locust and trial counsel. The district court made really no inquiry as to what the- But what is the nature of that conflict? What did the district court miss by failing to inquire further? Well, I'm going to now step back and say I believe that the district court may have created this conflict by the comments that were being made as the trial began. There were comments, somewhat sarcastic comments, made by the court to trial counsel. What are you doing? I don't understand what you're doing or whatever. Well, yeah, I mean, there were- But then that is just performance at the trial. That's not some kind of behind-the-scenes communication between the lawyer and his client, right? Well, but I think that the court's comments- And I'm sure the court wasn't doing it intentionally so that Mr. Locust would lose all of his confidence in trial counsel, but I think that was the effect that they had. So the effect was that Mr. Locust lost confidence in his trial counsel because the district court seemed to be commenting negatively on the trial counsel's performance. Is that right? I think that's a strong factor. I mean, from reading the record- Well, so if that's true, then what you've just said is, in fact, that he asked for a new counsel because of the performance at the trial. So the district court had observed his performance at the trial. Well, the district- I think the court's comments were somewhat over the line. Understand, I didn't raise a claim of bias by the district court or anything close to that. But whether intentionally or probably unintentionally, the court's comments had the effect of telling Mr. Locust, your attorney is not doing a good job. Okay, so you're saying that Mr. Locust made the application for a new attorney because he had gotten the message from the district judge that his attorney wasn't doing a good job. Is that right? That's the way I'm inferring. So if the district court had asked more questions, you would not have uncovered something going on behind the scenes between Mr. Locust and the attorney. You're saying it's because of his performance at the trial. Well, if there had been any kind of colloquy and the judge had inquired of my client, well, what's the problem? I think his answer would probably have been, well, you've been pointing out the problem. He doesn't seem to be on top of his game in this trial. So, in fact, the district court had what I don't know if you'd call it a finding, but the district court said, for the record, I think that their performance has been good, right? Well, yeah, because the district court immediately upon hearing the application said it's denied. In other words, I don't need to hear anything more. I've already decided your attorney is doing a fine job. There's no basis for your complaint. So we never had the actual colloquy that should have been held. Well, why do you feel dissatisfaction? But I keep asking you what the district court would have uncovered if he asked us further questions. And you're saying what he would have uncovered is Mr. Locust saying, well, you are telling me my lawyers are doing a bad job. But they had that colloquy because the district court says you're doing this because of their performance at trial. Is that correct? And he says yes. And then the district court says, well, I've observed their performance, and I think that their performance is adequate, right? I understand what the court is saying, but I think we needed more on the record. I guess that's what I just keep asking. So what is the more that would have happened? What is the issue that would have been uncovered? What is the remedy the district court would have – what is the reason why the district court would have ended up granting the application? Well, that Mr. Locust would have informed the court. My attorney doesn't know how to course examine. During his opening statement, he made some statements that the court felt were completely inappropriate. The court seems to be familiar with my trial counsel, has had cases in the past with him, and seems very disappointed by the way he's performing during this trial. I mean, these are all things stated on the record by the court during counsel's course examination and opening. So I think he would have had justification for pointing these things out, and then perhaps the court would have – And do you think the court should have – once getting that on the record, the court should have granted the application there in the middle of trial? Well, we don't know what the colloquy might have revealed. And perhaps talking it out on the record – Well, I'm inviting you to explain whatever you think it possibly could have revealed. Well, it could have. They would have had this exchange about my lawyer doesn't know how to do a cross-examination. So then you're saying that would have justified replacing the counsel in the middle of the trial. And my answer is yes, it might have, because if it appeared that the conflict was so irreversible and the relationship had dissolved to the point where there couldn't be any real communication between counsel and the client, yes, I'd say at that point. Or as an alternative, perhaps not appointing new counsel and relieving current trial counsel, but perhaps appointing another counsel to confer with Mr. Locust and explain what the process is. Maybe he didn't have confidence in trial counsel, so have another counsel step in and say, okay, here's what's going on. I've discussed it with your trial counsel. And maybe that would have ended the problem. But that never happened. And as a result, I think my client was denied his right to effective counsel as a result. Okay, thank you very much, Mr. Unger. Let's turn to the government. Ms. Rothman. Good morning, and may it please the Court. My name is Alexandra Rothman, and I represent the United States. I also represented the United States below. I'd like to respond to some of the points raised by opposing counsel this morning. And I'll start with the question of whether the victims were vulnerable victims for purposes of the two-level enhancement. Judge Stein found at the trial that the patients were targeted and recruited into the scheme based upon their financial vulnerability and homelessness. And there was overwhelming evidence of those facts on which the Court could base that two-level enhancement. And it was based upon that vulnerability that they agreed to have unnecessary medical procedures. There was a suggestion by Ms. Newman that the surgeries were necessary, and that is simply not the case. Patient after patient testified that the reason they had surgery was for the financial benefits, for the money that they were promised if they underwent unnecessary procedures. So they chose to do it. Well, Your Honor, they chose based upon their financial vulnerability and their homelessness. In 20 years in the trial court, every drug defendant I ever saw, that's not true, 99% of the drug defendants I ever saw got involved in drug dealing because they were financially, emotionally, mental illness, in some form of vulnerability they were suffering from. It didn't make them, for better or for worse, any less culpable under the law. So, especially the folks who testified, they talked about, hey, this was so good for me, I brought my girlfriend in, I got my cousin involved, I got my sister to come in. They were choosing a very poor choice, maybe, but they were choosing to get involved, right? Your Honor, I don't think that the trial testimony reflected patients glowing on the witness stand, raving about their involvement in a scheme. Not raving, but it was good enough to bring the people they loved into it. Your Honor, there were nuggets of testimony where a patient would say, I learned about this from a friend, I'm thinking of Wanda Diaz, who was one of the two patients who was living in a homeless shelter with her four children at the time that she got involved in this fraud scheme. And she learned of it from a cousin, Roberto Rosario, who connected her to Kerry Gordon, one of the primary recruiters in the fraud scheme. Jasmine Cunningham was living in a homeless shelter when he learned from his roommate, who was also in a homeless shelter, about a way to get involved in this fraud scheme. And so while I take Your Honor's point that financial desperation can sometimes encourage individuals to engage in criminal conduct, this case, respectfully, is different. Where individuals had anesthesia, multiple surgeries, essentially using their bodies as a way to make money, this case preyed upon that desperation. And Judge Stein was correct in applying a two-level enhancement for that reason. The conduct was so much worse because the people that were recruited into this scheme were so desperate. And I'll just add that not only were they desperate, but they were lied to and manipulated as to the terms of the lawsuits they were getting involved in. There was testimony of patient signatures being forged on agreements. So they didn't understand the financial terms of the loan agreements. There was a discussion by Jenna Northup, who was the representative from Fast Track, one of the primary funders. It's at the appendix at 804 to 807, where she goes through that the amount of money a patient would have to pay back to the funders essentially took away nearly all of the financial recovery. And so for those reasons, Judge Stein was correct to apply the vulnerable victim enhancement. I'm happy to turn to restitution, Your Honor. Again, Judge Stein did not err in applying the restitution award. This court has noted that restitution need not be exact. There can be an approximation. And here, there was more than sufficient evidence in the record for the court to find by a preponderance of the evidence that the restitution award was proper. Can I ask about the Duncan forfeiture? Yes, Your Honor. So the government modifies its request for the amount of forfeiture for Duncan based on a conversation it had with Gordon. They identified as a cooperating witness, but then we later find out that it's Gordon, right? Yes, Your Honor. Were the notes from any—was that in the record? Your Honor, the government— That conversation you had with Gordon? Your Honor, the government produced records of that conversation to defense counsel. Mr. Gordon pled guilty in the morning of trial and proffered with the government during the course of trial and then thereafter. And in the course of those conversations, Mr. Gordon made certain statements about the nature— The percentage that were slip and falls and the percentage that were fraudulent, right? Yes, Your Honor. He made statements about the percentage of business that D&G had. That was the business started by— So you produced the notes of that conversation to opposing counsel, but it's not before the court, right? Your Honor, the government represented that information to Judge Stein, and Judge Stein considered that in advance of sentencing. It's for that reason that the government agreed to a significant reduction in the requested forfeiture amount, which I'll note was— So the court relies just on the government's representation in this conversation it had with Gordon? I think that's right, Your Honor, although I guess there was— Is that evidence? I mean, can the district court do that? I don't think that defense counsel challenged the fact that the government was representing that information and then the court was relying upon it in deciding what an appropriate forfeiture award was. I'll note that D&G— Okay, so even if it's a clear error, I mean, I guess I'm asking is it an error? So if the information is not on the record, Gordon didn't testify to that, not even the notes from the conversation are in the record, or before the court, can the government just say, well, the government tells me it had a conversation with Gordon, and therefore I'm going to order restitution based on what the government says about this conversation it had? Your Honor, I don't think it was error for the court to rely upon that. Again, when we're talking about forfeiture, we're talking about a preponderance of the evidence. There was extensive— So the products of the evidence, is that just the government's say-so? Your Honor, I— And you told us this if you don't have a record of that conversation actually before the court? Presumably the defense could have asked for a hearing if they wanted to. I think, though, on these facts, the defense, at least Mr. Duncan's counsel, could have and chose not to. And so on that basis, the court could find that it had enough evidence in the record to conclude that the forfeiture order was appropriate. Even on its terms, Gordon says 40% of the cases were slip and falls, right? And so then the government seeks just 40% of the overall profits from T&G. That's correct, Your Honor. But Gordon also said that only 80% of the claims were fraudulent. So why not reduce it again to account for the number that weren't fraudulent? Your Honor, so Kerry Gordon didn't testify— I guess Kerry Gordon did provide information about the fraudulent nature of the scheme. I think, looking at the forfeiture order that was awarded, it was $644,000, which was a small fraction of the $1.6 million that— Yeah, I know, but you reduced it 40% because Gordon says 40% are slip and falls. And you say, well, we're just going to seek recovery for slip and falls because that's the evidence we put on. But Gordon also said that only 80% were fraudulent, meaning 20% were not fraudulent. So why not recover just for 80% of the slip and falls as opposed to all of them? Your Honor, I think that the court could rely upon the estimate that was provided by Kerry Gordon that 40% of the business was trip and falls and that 80% of the cases overall were fraudulent. I think— Right, but isn't the reduction just to the 40%? Sorry, you had the overall profits, which were $1.6 million, and then you reduced it by 40% to $644,000. That doesn't account for the 80%. Your Honor, I think—I mean, I think a few thoughts in response. I think it's true that the court's calculation as to forfeiture did not have an additional reduction for the 80%. It was $1.6 million, and we reduced it by 40%. But I think, first, this argument wasn't raised publicly. And second, there was sort of a—I think the sense— when people like Kerry Gordon and Peter Kalkanis testified to percentages of sort of what this fraud looked like, they would say 80%. And that wasn't a precise mathematical calculation. What they were getting at and what the government argued and what I think the jury understand is that this was a fraud scheme at its core. And while on occasion you might have a legitimate case here or there, by and large, this was a scheme. It recruited patients who had fake accidents. It encouraged them to have medical procedures they didn't need. And so—and the court heard that testimony. The court heard 11 patients testify to their fraudulent injuries. It heard two cooperators testify to the hundreds. Can I ask about also the sentence reductions, right? The court is going to—says it has a view of the order of culpability of the different defendants. But then it lowers Locust's sentence because it also lowered Duncan's, right? That's correct. And so why wouldn't it have also reconsidered Rainford? Like why should we remand for it to reconsider Rainford? Like how do we know that it wouldn't have wanted to lower the Rainford sentence in light of the reduction for Duncan? Well, Your Honor— Which it did for Locust. Well, Your Honor, this court, Judge Stein, has on three different occasions considered compassionate release motions from Mr. Rainford. And in denying those requests, the court reiterated its view that the 3553A factors did not warrant any reduction in sentences. So to answer Your Honor's question, we know the court would not have done something differently because when presented with the opportunity to do so on multiple occasions, including in October of 2020 after Brian Duncan was resentenced—well, sentenced to 72 months, which was lower than the initial 80-month sentence— So you're saying you're just pretty confident that he's going to stick to the original sentence? Well, I think there's two points. Can I ask about why he even lowered the sentence for Locust? Because the new evidence about Duncan was not even about a scheme in which Locust was involved, right? Correct, Your Honor. That Kerry Gordon's— So even though there was no connection between the reasons for lowering Duncan's sentence and Locust, he still thought that because he wanted to keep the relative sentences, you know, in a certain proportion, he's going to lower the Locust sentence. That is— So if that's true, why wouldn't that also—like, what's the reason why it wouldn't apply to Rainford as well? So, Your Honor, I think Ryan Rainford and Robert Locust are differently situated defendants, and whatever animated the court's decision to lower Locust's sentence after resentencing Duncan, those same facts would not apply to Ryan Rainford. But how do you know that? What are the— Yes, Your Honor. You just said the reasons for lowering Duncan's sentence didn't even apply to Locust, but he did it anyway. Your Honor, Ryan Rainford was involved in both conspiracies. He was involved during the entire course of the conspiracy, beginning in 2013, continuing into the arrests in 2018. After the split in 2015, Ryan Rainford continued with Peter Kalkanis, but also sent patients to Brian Duncan, and we've included some of those text messages in the supplemental appendix. You see from Ryan Rainford a managerial role, and while he didn't have an enhancement from a guidelines perspective, he was involved in the operations of the scheme to a greater degree than Robert Locust. And so if the court—if Your Honor is thinking about disparities, first, of course, 3553-A-6 speaks about national disparities. We're not talking about within co-defendants. But even if the court's going to look at the disparity between these three defendants, the sentences as given, which were all way below the guidelines, do appropriately reflect the involvement of these three defendants in this scheme. And so that, I think, is why this court should not remand for resentencing with respect to Ryan Rainford. Can I just ask a follow-up on loss amount? Yes, Your Honor. It looked to me like somehow the number of 400 settlements sort of snuck into the PSRs. I can't find any evidence. And my law clerk and I, we were cross-referencing, right, all these places, and I can't find a piece of actual evidence for 400, just a statement in the PSR. So, Your Honor, I think this is most relevant to Ryan Rainford because he's the one who's involved in—well, so two things. First, Peter Kalkanis said approximately 300, if not more. That's the first piece of testimony. So Peter Kalkanis wasn't saying there were 300 and that's the most. In fact, it was different testimony. Ryan Rainford was involved in both conspiracies, meaning the original conspiracy as well as additional cases that he was referring to Brian Duncan. Based upon that and based upon sort of the evidence of the volume of the business, the government—the PSR includes facts that were not objected to below about there being around 400 cases that were involved in this fraud scheme. So it's Peter Kalkanis' scheme, and then after the separation, it's the cases that Brian Duncan and Kerry Gordon were also doing. But if the court is thinking how this affects loss amount, and if the court is sort of—I'll just add that the way loss amount was calculated was by taking that number and multiplying it by an average about $100,000 per settlement. That number was extremely conservative. I know there was some discussion during— How many exemplars did we have? Out of the 300 or 400 total settlements, how many exemplars did we have and how do we know they were representative of the full corpus of those settlements? So here's a couple of data points in the record of both settlements received and discussions with patients about what they could expect to receive. And if we're thinking in terms of intended loss, that is equally probative as the court thinks about what a fair intended loss amount is. So Robert Locust told Clarence Tucker he can make $100,000 or more. Let me back up and just ask you the question. Do you have a number? I thought it was 38 or something. There was some number of settlements. Right, because in civil practice, for example, someone will say there's 1,000 of these and we say, okay, we're going to base the assessment on 100. We have a representative subset, and I'm trying to figure out— I saw four or five discussed in detail at trial, but that wouldn't be enough to extrapolate to 300 or 400, right? How do we know that we have enough and that they are representative of the larger group? Well, Your Honor, all of the evidence at trial was that patients were promised that if they would engage in this fraud scheme, they could make north of approximately $100,000. And so based upon that, which is consistent what generally the insurance companies submitted when they sought restitution for about 38 cases, that is more than enough for the court to find by a preponderance of the evidence that the intended loss here exceeded, for each of the two defendants, the bottom of the guidelines enhancement. So if we got 300, if we don't find there's enough for 400, and we get 300 at $100,000, 80% of that is $24 million, which is two offense levels lower, right? Yes, but that is correct. However, the $100,000 is extremely conservative, and in fact far too conservative. Kasheem Jones settled for $200,000. Did you ask for a larger per settlement number? Did you ask the court to consider a larger number? Or are you sort of saying, fudge it, Judge, because we think that one of these numbers, the $100,000, is kind of conservative, even though we have to concede the 80% might be kind of high in light of the statement about majority. That feels like a very loose kind of math here. So, Your Honor, I don't think we asked Ed Stein to fudge it. I think we presented overwhelming evidence of a fraud scheme in which patients were recruited on promises of making hundreds of thousands of dollars, and that the volume of this fraud scheme was north of 300. And based upon that, the court could find, as to Ryan Rainford and Robert Locust, that the loss amount was at least $25 million for Ryan Rainford and at least $9.5 million for Robert Locust. With respect to Robert Locust, the court only needed to find about 119 cases at $100,000 to exceed the $9.5 million. And I think there's abundant evidence in the record for the court to have made that finding, given, as Your Honors noted, he is the guy driving carloads of patients to and from their various appointments. As to Ryan Rainford, again, he's involved in both conspiracies. So based upon that, the court didn't err, didn't clearly err, in finding that the loss amount was at least $25 million. Unless there are any other questions, Your Honor, we respectfully request that the court affirm the judgments of conviction. Thank you very much, Ms. Rothman. And we'll turn back to Ms. Newman on the vote. Thank you. Thank you. Thank you very much. There are many things that I'd like to discuss because much of it is said incorrectly and it's based on a view of the record. And as I've demonstrated in our brief, in both our reply and our initial opening brief, that the record, you cannot look piecemeal, myopically at the record, and that's what the government did and that's what the court did because the general testimony from the 11 witnesses, not one said they were destitute. And that they did this, they did it for money, which we can all agree is a fraud case, that's nothing unusual, but that they did it because they needed it. And I have disagreement with the fact that these were unnecessary. Now, I'm not a doctor, and nobody came forward and authored doctors' testimony. They may have been injured, and they may have been injured in the slip and fall. They may have pre-existing, and I have a whole list of pre-existing that was part of our brief. That doesn't mean it was unnecessary. So we're only a doctor. Now, they may have testified it was unnecessary, and I, as an individual, may often say to my doctor, no, I'm not having that surgery, that's not necessary, and we all know my doctor would laugh and say, and who are you? Now you have a medical degree. So I have the same concerns with the record here. Now, particularly the judge felt that Kara White, who had trouble with the anesthesia, that was very problematic for her. But remember, she's the one who sought this out after a knee injury. So it seems she would have had the knee, assumably, the new operation, but she wanted to get it for free and get paid. So that's not. With respect to what I did want to point out, when we look at the definition, the background comments for 3A1.1, I think fits in here, because it says the victim would not apply, vulnerable victim would not apply, in a case where the defendant sold fraudulent securities by the mail to the general public and one of the victims happens to be senile. And I think that more closely resembles what happened here, because- You're saying the vulnerability was incidental. If it turned out that somebody was vulnerable, that's not why they were targeted, is that- They were not targeted, right? They were targeted because they- I think we have that argument. Thank you very much. Thank you very much. Ms. Newman, the case is submitted. Thank you. And because that is the last case on our calendar this morning, we are adjourned.